```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

ANTOINETTE ROGALSKI,             )
                                 )
          Plaintiff,             )
                                 )
     v.                          )      No. 4:10 CV 2391 DDN
                                 )
                                 )
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
          Defendant.             )

## MEMORANDUM OPINION

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Antoinette Rogalski for disability insurance benefits under Title II of the Social Security Act (Act), 42 U.S.C. § 423, and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1382. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.)

For the reasons set forth below, the court reverses the decision denying benefits and remands.

## I. BACKGROUND

Plaintiff Antoinette Rogalski, who was born in 1962, filed her applications for disability insurance benefits and supplemental security income on November 14, 2008, alleging she became disabled on April 12, 2008, on account of discogenic and degenerative back disorder and depression. (Tr. 56-57, 187-94.) Her claims were denied initially on February 19, 2009. (Tr. 58-62.) On April 21, 2010, following a hearing, an administrative law judge (ALJ) ruled plaintiff was not disabled under the Act. (Tr. 9-15.) On October 20, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-3.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

On September 19, 2007, plaintiff visited John Rice, M.D., complaining of depression and neck pain.  Dr. Rice diagnosed muscular neck strain and major depression.  He recommended stretching for plaintiff's neck pain and prescribed Effexor for her depression.  (Tr. 284.)

On October 10, 2007, plaintiff saw Dr. Rice for throat pain, pelvic discomfort, and general body aches.  Plaintiff rated her pain as a 6 on a 1 to 10 scale.  Dr. Rice diagnosed a urinary tract infection and prescribed Ciprofloxacin, an antibiotic,[1] and recommended increased fluids.  (Tr. 283.)

On April 10, 2008, plaintiff visited Barnes-Jewish St. Peters Hospital due to dizziness and difficulty with her memory.  The treating physician diagnosed chronic sinusitis and prescribed Claritin.  (Tr. 303-04.)

On April 16, 2008, plaintiff saw Dr. Rice upon reports of anxiety attacks, an inability to concentrate or focus, and concern for her blood pressure because of her hypertension.  Dr. Rice prescribed plaintiff with Xanax and told plaintiff to continue taking her hypertension medication.  (Tr. 282.)

On May 20, 2008, plaintiff returned to Barnes-Jewish St. Peters with flu-like symptoms.  Plaintiff was given Zofran, an anti-nausea medication,[2] and Toradol, a pain reliever.[3]  Several lab tests were conducted.  On May 21, 2008, an abdominal CT revealed an adrenal mass and hepatic cysts.  Plaintiff was diagnosed with chills accompanied by a fever, abdominal pain, and a urinary tract infection.  (Tr. 306-14.)

---

[1] Ciprofloxacin is used to treat a variety of bacterial infections. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[2] Zofran is to prevent nausea and vomiting.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[3] Toradol is used for the short-term treatment of moderate to severe pain in adults. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

On 11 occasions in July, August, September, and October, 2008, plaintiff visited Psych Care Consultants due to mental issues and difficulty sleeping.  On July 11, 2008, plaintiff was diagnosed with depression and anxiety and prescribed Celexa, an antidepressant,[4] and had begun taking Lexapro, an anti-anxiety medication.[5]  On August 8, 2008, plaintiff discontinued Celexa.  On August 11, 2008, plaintiff began taking Cymbalta, an antidepressant,[6] and anti-anxiety medication.  It was noted that she had major depression and sciatica.  Beginning September 10, 2008, plaintiff was diagnosed with bipolar disorder and prescribed Seroquel, a medication used to treat mental illnesses.[7]  On October 10 2008, plaintiff was diagnosed with chronic pain.  (Tr. 318-28.)

On August 10, 2008, Plaintiff returned to Barnes-Jewish St. Peters Hospital for complaints of a burning pain that started in her buttocks, going through her left leg and to her toes.  She was diagnosed with sciatica and prescribed Percocet, a pain reliever.  (Tr. 299-301.)

Plaintiff was admitted to CenterPointe Hospital from August 15, 2008, through August 27, 2008.  She complained of crying spells, increased anxiety, racing thoughts, and feelings of hopelessness and helplessness.  Her condition was noted as stable upon discharge and her diagnoses were major depressive disorder, recurrent, severe and sciatic nerve injury.  She was taking Cymbalta, Seroquel, and Lexapro.  Upon discharge, her Global Assessment of Functioning (GAF) score was 40,[8] which

---

[4]Celexa is used to treat depression.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[5]Lexapro is used to treat depression and anxiety.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[6]Cymbalta is used to treat depression and anxiety.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[7]Seroquel is used to treat certain mental/mood conditions, including bipolar disorder and schizophrenia.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[8]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second
(continued...)

was the same as upon admission and the highest score in the past year. (Tr. 259-60.)

On September 2, 2008, plaintiff returned to Dr. Rice to follow-up with her depression.  Dr. Rice noted that her depression was slowly improving and told plaintiff to continue with Seroquel and Cymbalta.  Dr. Rice also recommended that plaintiff return to work in order to improve her mental health.  During this visit, plaintiff also complained of pain from her left buttocks going down through her left leg.  Dr. Rice diagnosed left-sided sciatica and prescribed Medrol, an anti-inflammatory medication.[9]  (Tr. 281.)

On October 23, 2008, plaintiff visited Daniel T. Mattson, M.D., M.Sc., for a neurological consultation due to left leg pain.  Plaintiff also complained of a diffuse, burning type sensation in her back, occasional incontinence, and heavy menstrual bleeding.  Dr. Mattson ordered an MRI of the spine, an abdominal and pelvic CT, nerve conduction testing, and several other tests.  He also prescribed Neurontin, a pain reliever.[10]  He opined that her symptoms sounded like a peripheral process related to sciatica and that her massive weight loss may indicate a malignancy.  (Tr. 332-33.)

On October 27, 2008, the MRI and CT ordered by Dr. Mattson were performed.  On November 13, 2008, Dr. Mattson opined that plaintiff's

---

[8](...continued)
component covers functioning.  A patient's GAF score represents the worst of the two components.  On the GAF scale, a score from 31 to 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

[9]Medrol is used to treat various conditions such as allergic disorders, arthritis, blood diseases, breathing problems, certain cancers, eye diseases, intestinal disorders, and skin diseases.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[10]Neurontin is used to prevent and control seizures and to relieve nerve pain following shingles in adults.  WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

imaging work-up did not show any malignant process and suspected a significant psychogenic overlay to plaintiff's pain complaints. He referred plaintiff to Dr. Vellinga for pain management. (Tr. 330.) A nerve conduction test was consistent with mild peroneal neuropathies. However, no cause for plaintiff's symptoms was identified. (Tr. 340.)

On December 2, 2008, plaintiff underwent an MRI and ankle/brachial index test due to leg pain. The test showed no evidence of resting arterial insufficiency of the lower extremities. (Tr. 355-56.)

Plaintiff then began to visit Michael Spezia, M.D., from February to October, 2009. On February 26, 2009, plaintiff was taking Azithromycin, an antibiotic,[11] Ciproflox for her eyes, Ranitidine, an antacid medication,[12] and a proair inhaler. On April 20, 2009, after an abdominal and pelvic CT, Dr. Spezia diagnosed abdominal pain. (Tr. 382-94.)

On February 11, 2009, Nancy Dunlap completed a Physical Residual Functional Capacity Assessment (RFC) of plaintiff for the period of April 12, 2008, to April, 2009. Ms. Dunlap concluded that plaintiff could occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. Ms. Dunlap also determined that plaintiff could stand and/or walk about six hours in an eight-hour workday and could sit for about six hours in an eight-hour workday. Finally, Ms. Dunlap noted that plaintiff had multilevel degenerative disc disease with no significant compressive deformities. (Tr. 361-66.)

On February 17, 2009, Richard Moreno, Psy.D., Ph.D., completed a Psychiatric Review Technique of plaintiff. Dr. Moreno noted depression and bipolar disorder. He also noted moderate limitation of daily living activities, social functioning, and maintaining concentration, persistence, or pace. (Tr. 367-75.) Dr. Moreno also completed a Mental

---

[11]Azithromycin is used to prevent and treat a very serious type of infection. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

[12]Ranitidine is used to treat ulcers of the stomach and intestines and to treat certain stomach and throat problems caused by too much stomach acid. WebMD, http://www.webmd.com/drugs (last visited November 9, 2011).

Residual Functional Capacity Assessment.  In his assessment, Dr. Moreno found that plaintiff was generally moderately limited in her understanding and memory, sustained concentration and persistence, social interaction, and adaptation.  Overall, he concluded that plaintiff retained the ability to understand, remember, and carry out simple instructions.  (Tr. 378-80.)

**Testimony at the Hearing**

On November 16, 2009, plaintiff testified to the following at a hearing before an ALJ.

Plaintiff has been living with her son in his home in St. Louis, Missouri since November, 2008.  (Tr. 34.)  She has completed the twelfth grade.  She did assembly line and production work at a Schnucks Bakery plant until April 12, 2008.  (Tr. 35.)  At the time of the hearing, she was no longer seeing a psychiatrist or psychologist and was not taking any psychogenic medication.  (Tr. 37-38.)  She has spinal degenerative disc disease causing inflammation in her left lower extremity.  She takes medication for acid reflux and stomach problems.  (Tr. 38.)  At the hearing, plaintiff was no longer alleging any mental impairment.  (Tr. 40.)

Plaintiff can only sit for 15 minutes and then she has to stand up and move around.  She can only stand up and walk around for about three minutes before she has to sit down.  She cannot go up and down steps.  When taking a shower, she needs her son's fiancé to assist her.  She tries to sweep the floors with a broom but can only do very little of that.  (Tr. 41-42.)

After making coffee in the morning, plaintiff sits in her kitchen because she cannot walk from the kitchen to the front room.  She tries to do the dishes but cannot stand up for very long, so she sits down, but cannot do that for very long either, so she must stand up again.  She is frequently sits down and then stands up again.  (Tr. 42)  She walks her dog around the house but after walking halfway to the backyard, about 20 feet, she has to sit down.  (Tr. 43.)  After walking the dog, she sits on the couch, but then must stand up again in 15 minutes and continues alternating between sitting and standing.  She spends most of her day

either sitting or standing. She does not leave the house or interact with anyone during most of the day. (Tr. 44.) In the afternoon, plaintiff mostly naps on the couch because she does not have a bed. She naps and sleeps only 20 minutes at a time. Her son cooks and does the dishes for her because she cannot stand. She spends her evenings sitting and standing. (Tr. 45-46.)

Plaintiff also spends much of the day in the bathroom and often does not eat because of her colon. During her monthly menstrual cycle, her endometriosis causes her problems and makes it difficult to wear her white bakery uniform while at work. Sometimes her cycle lasts 28 days. (Tr. 46-47.)

Plaintiff has a painful and burning sensation in her left leg that prevents her from laying down on her left side. Her leg is in pain and burns whether she is laying down or walking. Dr. Spezia told her that she cannot take anything for her joints or back problem. He told her that it was going to get worse and that she would eventually be confined to a wheelchair. (Tr. 48.) She feels her back is getting worse and cannot lift her left arm. (Tr. 49.)

### III.   DECISION OF THE ALJ

On April 21, 2010, the ALJ issued an unfavorable decision. (Tr. 9-15.) At Step One, the ALJ found that plaintiff met the insured status requirements of the Act and had not engaged in substantial gainful activity since April 12, 2008, her alleged onset date. At Step Two, the ALJ found that plaintiff had severe impairments of degenerative disc disease and obesity. The ALJ also noted that at the hearing plaintiff testified that she was no longer receiving medication for a psychiatric impairment and was not alleging a mental impairment. (Tr. 11.)

At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing.

The ALJ then found that plaintiff had the RFC to perform "light" work as defined in the regulations, except that she is limited to occasional bending, stooping, crouching, and crawling. (Tr. 12.) The ALJ found that the plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, but that her impairments, symptoms, and limitations were not as extreme as she alleged. However, the ALJ found that plaintiff was not credible in her statements about the intensity, persistence, and limiting effects of the symptoms and that these statements were inconsistent with the RFC assessment. Id. The ALJ also noted that plaintiff's failure to seek the pain management recommended by Dr. Mattson and failure to follow up with Dr. Mattson was an indication that her symptoms were not as severe as alleged. The ALJ further found the lack of any prescription for strong pain medication inconsistent with plaintiff's complaints of disabling pain. Id.

In further examination of plaintiff's lack of credibility, the ALJ reasoned that plaintiff did not apply for disability benefits until after she lost her home. Plaintiff was able to stay in her son's home alone while he had a full-time job. The ALJ further noted that Dr. Rice advised plaintiff to go back to work and that none of her treating or examining physicians stated that she was disabled or unable to work. (Tr. 14.)

At Step Four, the ALJ found that plaintiff was able to perform her past relevant work as a donut maker, as she performed it. The ALJ therefore found plaintiff not disabled under the Act. (Tr. 14.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary

-8-

outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires, 564 F.3d at 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work. Id. The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work. Id. If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work in the national economy. Id.

## V.  DISCUSSION

Plaintiff argues the ALJ erred by failing to sufficiently analyze or explain the determination of her credibility and failed to sufficiently analyze, and order consultations for, her mental impairments. Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ did not sufficiently consider her obesity and failed to get consultations about limitations arising from her obesity. Finally, plaintiff argues that the ALJ erred in analyzing the bending and stooping requirements of her past relevant work and failed to get appropriate vocational testimony.

**Credibility**

Plaintiff argues that the ALJ failed to conduct a thorough credibility analysis supporting the determination of plaintiff's credibility as required by Polaski v. Heckler[13]. The credibility of a claimant's subjective testimony is primarily a decision for the ALJ, not the courts. Pearsall v. Massanari, 274 F.3d 1211, 1217-18 (8th Cir. 2001).

In Polaski v. Heckler, the Eighth Circuit held that when weighing a claimant's testimony, the ALJ must take into account (1) the claimant's daily activities; (2) the duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) any functional restrictions. Polaski, 739 F.2d at 1322. The presence or absence of objective medical evidence is a factor that the ALJ may consider. Mouser v. Astrue, 545 F.3d 634, 638 (8th Cir. 2008).

The ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination. Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007).

The ALJ in this case did not err in assessing plaintiff's credibility. At the hearing, plaintiff testified that her symptoms were so severe and limiting that she could do no more than spend her entire day at home alternating between sitting and standing. (Tr. 43-44.) Plaintiff testified that she could only stand for a few minutes and then she had to sit down, but that she could only sit down for several minutes and then had to stand up. (Tr. 41-42.) Plaintiff also testified that her impairment made sleeping and chores difficult, and that her symptoms are so severe that she could not walk up and down stairs and could not take a shower without assistance. (Tr. 41-45.)

In discounting plaintiff's credibility, the ALJ reasoned that none of plaintiff's treating physicians stated that she was disabled or unable to work; one of plaintiff's doctors recommended that she return to work.

---

[13]739 F.2d 1320 (8th Cir. 1984)

(Tr. 281.) That a physician did not "submit[ ] a medical conclusion that [the claimant] is disabled and unable to perform any type of work" is a significant factor for the ALJ to consider. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000).

Furthermore, the ALJ noted that plaintiff failed to follow up and pursue ongoing care for her symptoms, despite a request to do so. (Tr. 13, 330.) If there is no evidence of ongoing pursuit of care from accepted sources, an ALJ may properly discount a claimant's credibility based on a failure to pursue regular medical treatment. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003); see Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicts her subjective complaints of disabling conditions and supports the ALJ's decision to deny benefits).

In her disability report, plaintiff stated that she had not sought pain management treatment because her insurance ran out. (Tr. 241.) An inability to pay may justify a claimant's failure to seek medical care. Vasey v. Astrue, No. 1:08 CV 46 SWW/JTR, 2009 WL 4730688, at *5 (E.D. Ark. Dec. 3, 2009); Skovlund v. Astrue, No. CIV 08-4078, 2009 WL 3055421, at *24 (D.S.D. Sept. 24, 2009). However, a claimant must present "supporting evidence" that her failure to seek medical treatment was due to the expense. George v. Astrue, 301 F. App'x 581, 582 (8th Cir. 2008)(per curiam); see also Carrigan v. Astrue, No. 4:08 CV 4018, 2009 WL 734116, at *6-7 (W.D. Ark. Mar. 17, 2009) (claimant's "bare statement" that he is unable to afford medical treatment is insufficient to establish that inability). Since plaintiff did not "identify any steps she took to obtain low cost medical care," and because "she did not testify that she was denied medical care because of her financial condition," the ALJ properly considered her lack of follow up medical treatment in discounting her credibility. Weaks v. Shalala, 1993 WL 498046, at *1, 12 F.3d 1104 (8th Cir. 1993) (unpublished table opinion); see also Osborne v. Barnhart, 316 F.3d 809, 812 (8th Cir. 2003); Carrigan, 2009 WL 734116, at *7.

The ALJ also noted that plaintiff was not taking any strong pain medication. A lack of strong pain medication is inconsistent with

subjective complaints of disabling pain. Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999). Finally, the ALJ took into consideration that plaintiff did not apply for disability benefits until after she lost her home. (Tr. 14, 322.)

While the ALJ did not recite and individually discuss each Polaski factor, the ALJ's analysis reflects that the ALJ considered the relevant factors. Therefore, the ALJ did not err in assessing plaintiff's credibility. Casey, 503 F.3d at 695 (recognizing that the ALJ need not expressly state and discuss each Polaski factor).

**Mental Impairment**

Plaintiff argues that the ALJ erred in analyzing her mental condition and failed to develop a full and fair record by not ordering appropriate consultative examinations regarding her mental issues.

"A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). Failure of an ALJ to develop a full and fair record on an issue necessitates reversal and remand of that issue. Highfill v. Bowen, 832 F.2d 112, 115 (8th Cir. 1987). However, reversal due to failure to develop a full and fair record is warranted only where such failure is unfair or prejudicial. Haley v. Massanari, 258 F.3d 742, 750 (8th Cir. 2001); Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995).

If a claimant does not assert any limitation in function resulting from an impairment at the hearing, the claimant waives the right to raise the claim on appeal. Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003). Furthermore, an ALJ is under no "'obligation to investigate a claim . . . not offered at the hearing as a basis for disability.'" Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (citation omitted).

At her hearing, plaintiff expressly stated that she was not pursuing a mental impairment, was not seeing a psychiatrist or psychologist, and was not taking psychiatric medication. (Tr. 37-38, 41.) Based on this record, the ALJ was under no duty to explore and evaluate whether plaintiff suffered from a disabling mental impairment.

**Residual Functional Capacity**

Plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to properly analyze and consider the nonexertional limitations caused by her obesity. Plaintiff also argues that the ALJ erred in not ordering any consultative examinations to determine the effects of her obesity.

A claimant's RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of her limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 404.1545(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704.

"When a claimant suffers from exertional and nonexertional limitations, and the exertional limitations alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional limitations further diminish the claimant's work capacity." McGeorge v. Barnhart, 321 F.3d 766, 768 (8th Cir. 2009). "Nonexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work." Asher v. Bowen, 837 F.2d 825, 827 n. 2 (8th Cir. 1988). Examples include "mental, sensory, or skin impairments, as well as impairments which result in postural and manipulative limitations or environmental restrictions." Id.; see 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e) (1992). Obesity is an impairment which might cause nonexertional limitations and which might significantly restrict a claimant's ability to perform the full range of sedentary work. Lucy v. Chater, 113 F.3d 905, 909 (8th Cir. 1997).

However, the ALJ need not discuss the claimant's obesity in an RFC determination if no physician placed physical limitations on the claimant's ability to perform work-related functions because of the obesity. See McNamara v. Astrue, 590 F.3d 607, 611 (8th Cir. 2010);

Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004). A claimant's failure to allege work-related limitations caused by obesity further supports an ALJ's abstention from discussing the claimant's obesity. McNamara, 590 F.3d at 611; see Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003).  If "neither the medical records nor [the claimant's] testimony demonstrates that her obesity results in additional work-related limitations," then "it [is] not reversible error for the ALJ's opinion to omit specific discussion of obesity" in the RFC analysis. McNamara, 590 F.3d at 612.

The ALJ in this case determined that plaintiff's obesity was severe. (Tr. 11.)  However, none of plaintiff's physicians placed any physical limitations on her ability to perform work-related functions because of her obesity; Dr. Rice recommended that plaintiff return to work.  (Tr. 281.)  Furthermore none of plaintiff's physicians noted her obesity and none placed any physical limitations on her ability to perform any functions, work-related or otherwise.  At the hearing, plaintiff did not testify to any work-related limitations caused by her obesity. (Tr. 31-53.)  Because neither plaintiff's medical records nor her testimony indicated that she had work-related limitations from her obesity, the ALJ's failure to discuss any work-related limitations caused by her obesity or to order a consultative examination was not error. McNamara, 590 F.3d at 612; see Strickland v. Barnhart, 143 F. App'x 726, 727 (8th Cir. 2005) (per curiam) (holding ALJ's failure to discuss the effect of the claimant's obesity on the claimant's RFC was not error because no physician had imposed any work-related limitations related to the claimant's obesity).

Plaintiff next argues that the ALJ erred in determining her RFC by improperly expressing the RFC determination initially in terms of the exertions required for "light" work.  SSR 96-8p states in relevant part that:

> At step 4 of the sequential evaluation process, the RFC must not be expressed initially in terms of the exertional categories of "sedentary," "light," "medium," "heavy," and "very heavy" work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it.

SSR 96-8p, 1996 WL 374184 (July 2, 1996).

In her opinion, the ALJ stated that plaintiff had the "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she is limited to occasional bending, stooping, crouching, and crawling." (Tr. 12.) While the ALJ did express plaintiff's RFC in terms of the "light" exertional category, the ALJ also referred to the appropriate statutory definitions of "light," and specifically addressed plaintiff's ability to bend, stoop, crouch, and crawl. Moreover, the ALJ's RFC determination is supported by a narrative discussion. Knox v. Astrue, 327 F. App'x 652, 657 (7th Cir. 2009) ("Although the RFC assessment is a function-by-function assessment, . . . the expression of a claimant's RFC need not be articulated function-by-function."). While the ALJ's decision writing may have been deficient, plaintiff has not shown how this affected the ALJ's decision. See, e.g., Buckner v. Astrue, 646 F.3d 549, 559 (8th Cir. 2011) (holding that reversal is not required by an ALJ's deficient opinion writing unless that deficiency affected the outcome). Thus, the ALJ's use of "light work" in plaintiff's RFC does not require remand.

**Past Relevant Work**

Plaintiff argues that the ALJ erred in analyzing the bending and stooping requirements of her past relevant work as a donut maker in a bakery plant. The court agrees.

An ALJ is required to make explicit findings of the actual physical and mental demands of the claimant's past relevant work and then must compare them with the claimant's RFC. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000); Ingram v. Chater, 107 F.3d 598, 604 (8th Cir. 1997). For cases involving severe exertional impairments, such as degenerative disc disease and obesity, where the ALJ as here finds the claimant is limited to occasional bending, stooping, crouching, and crawling, "[d]etailed information about strength, endurance, and manipulative ability" must be obtained. SSR 82-62, 1982 WL 31386, at *3. In this connection, the ALJ has the responsibility to obtain information concerning the work the claimant has done during the relevant period of time. See 20 C.F.R. § 404.1560(b)(2). Sources of this information

include, without limitation, vocational experts or specialists, the Dictionary of Occupational Titles (DOT) and its companion volumes and supplements, published by the Department of Labor, as well as the claimant's own description of her past work.  (Id.)  In a decision that the claimant can perform her past relevant job, the ALJ must explicitly describe the physical and mental demands of this job and decide whether plaintiff's RFC would permit her to return to this past work. SSR 82-62, 1982 WL 31386, at *4.

The ALJ did not make sufficient, specific findings of what physical and mental abilities were necessary to perform plaintiff's former employment as a donut maker in a bakery factory.  The only finding in this regard was conclusory.  (Tr. 14)("The claimant is capable of performing past relevant work as a donut maker, as she performed it. This work does not require the performance of work related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965)").  Therefore, the action must be reversed and remanded for the rendering of these cardinal findings.

**Vocational expert testimony**

Plaintiff argues that the ALJ should have solicited testimony from a vocational expert because she was unable to perform her past relevant work and because she suffered from nonexertional limitations.  Because the ALJ must reconsider on remand whether plaintiff can perform her past relevant work, the need for consideration of vocational expert testimony will be considered by the ALJ on remand.

### VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded for further proceedings consistent with this memorandum opinion.  An appropriate Judgment Order is issued herewith.

          /S/    David D. Noce
          **UNITED STATES MAGISTRATE JUDGE**

**Signed on November 28, 2011.**